UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOHN C. WICHTERMAN,

          Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-06-339-AMJ

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT are cross-motions for summary judgment noted for hearing without oral argument on May 29, 2007.  (Ct. Rec. 14, 20).  Attorney Maureen J. Rosette represents Plaintiff; Special Assistant United States Attorney Joanne E. Dantonio represents the Commissioner of Social Security ("Commissioner").  Plaintiff filed a reply brief on May 29, 2007. (Ct. Rec. 23).  The parties have consented to proceed before a magistrate judge. (Ct. Rec. 7, 26.) After reviewing the administrative record and the briefs filed by the parties, the court **GRANTS** Defendant's Motion for Summary Judgment (Ct. Rec. 20) and **DENIES** Plaintiff's Motion for Summary Judgment (Ct. Rec. 14.)

## **JURISDICTION**

Plaintiff filed applications for Disability Insurance  Benefits ("DIB") and SSI received on January 25, 2000,  alleging an onset  date of September 17, 1998.   (Tr. 93-95).  The application was denied initially and on reconsideration. (Tr. 70-73, 78-80.)   Administrative Law Judge ("ALJ") Richard Hines held a hearing on September 19, 2001.  (Tr. 35-67).  On November 30,

2001, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 17-27.)  The Appeals Council denied a request for review on September 19, 2002.  (Tr. 6- 8).  Plaintiff appealed to the district court and on May 12, 2003, pursuant to the parties' stipulation, the court ordered the case remanded for further administrative proceedings.  (Tr. 361-362).

Plaintiff filed second applications for DIB and SSI on March 20, 2002.  (Tr. 518-520, 767-769).  The claim was denied initially and on reconsideration.  (Tr. 771-774, 776-778; 506-509, 512-514).  Plaintiff timely filed a hearing request.  (Tr. 515.)  The Appeals Council directed that the two claims be consolidated.  (Tr. 358-360).  A second hearing on both claims was held November 10, 2003, before ALJ Mary Bennett Reed.  (Tr. 779-820).  Medical expert W. Scott Mabee, Ph.D., vocational expert Daniel McKinney, and plaintiff testified.  On November 23, 2004, the ALJ found plaintiff was not disabled.  (Tr. 333-354).  On November 14, 2006, the Appeals Council denied review.  (Tr. 321-324).  Therefore, the ALJ's decision became the final decision of the Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g).  Plaintiff filed this action for judicial review pursuant to 42 U.S.C. § 405(g) on November 30, 2006. (Ct. Rec. 4).

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcripts, the ALJ's decisions, the briefs of both Plaintiff and the Commissioner, and will only be summarized here.

Plaintiff was 41 years old on the date of the decision.  (Tr. 334).  He has a high school education and completed a five year apprenticeship to become a journeyman pipe fitter/plumber. (Tr. 794, 787).  Plaintiff worked as a pipe fitter.  (Tr. 48).  He alleges disability as of September 17, 1998, due to lung problems caused by exposure to chemical contaminants, arthritis, and mental impairments.  (Tr. 334).

## SEQUENTIAL EVALUATION PROCESS

The Social Security Act (the "Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment  which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  The Act also provides that a Plaintiff shall be determined to be under a disability only if any impairments are of such severity that a Plaintiff is not only unable to do previous work but cannot, considering Plaintiff's age, education and work experiences, engage in any other substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).    Thus, the definition of disability consists of both medical and vocational components.  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

The Commissioner has established a five-step sequential  evaluation process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920.  Step one determines if the person  is engaged in substantial gainful activities.  If so, benefits are denied.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, the decision maker proceeds to step two, which determines whether Plaintiff has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If Plaintiff does not have a severe impairment or combination of impairments, the disability claim is denied.  If the impairment is severe, the evaluation proceeds to the third step, which compares Plaintiff's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); 20 C.F.R. § 404 Subpt. P App. 1.  If the impairment meets or equals one of the listed impairments, Plaintiff is conclusively presumed to be disabled.  If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents Plaintiff from performing work which was performed in the past.  If a Plaintiff is able to perform previous work, that Plaintiff is deemed not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).   At this step, Plaintiff's residual functional capacity ("RFC") assessment is considered.  If Plaintiff cannot perform this work, the fifth and final step in the process determines whether Plaintiff is able to perform other work in the national economy in view of Plaintiff's residual functional capacity, age, education and past work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Bowen v. Yuckert*, 482 U.S. 137 (1987).

The initial burden of proof rests upon Plaintiff to establish a *prima facie* case of

1    entitlement to disability benefits.  *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971); *Meanel v.*

2    *Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  The initial burden is met once Plaintiff establishes that

3    a physical or mental impairment prevents the performance of previous work.  The burden then

4    shifts, at step five, to the Commissioner to show that (1) Plaintiff can perform other substantial

5    gainful activity and (2) a "significant number of jobs exist in the national economy" which

6    Plaintiff can perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

7         Plaintiff has the burden of showing that drug and alcohol addiction ("DAA") is not a

8    contributing factor material to disability.  *Ball v. Massanari*, 254 F. 3d 817, 823 (9th Cir. 2001).

9    The Social Security Act bars payment of benefits when drug addiction and/or alcoholism is a

10   contributing factor material to a disability claim.  42 U.S.C. §§ 423 (d) (2) (C) and 1382 (a) (3) (J);

11   *Sousa v. Callahan*, 143 F. 3d 1240, 1245 (9th Cir. 1998).  If there is evidence of DAA and the

12   individual succeeds in proving disability, the Commissioner must determine whether the DAA is

13   material to the determination of disability.  20 C.F.R. §§ 404.1535 and 416.935.  If an ALJ finds

14   that the claimant is not disabled, then the claimant is not entitled to benefits and there is no need to

15   proceed with the analysis to determine whether addiction is a contributing factor material to

16   disability.  However, if the ALJ finds that the claimant is disabled and there is medical evidence of

17   drug addiction or alcoholism, then the ALJ must proceed to determine if the claimant would be

18   disabled if he or she stopped using alcohol or drugs.  *Bustamante v. Massanari*, 262 F. 3d 949 (9th

19   Cir. 2001).

20                                   **STANDARD OF REVIEW**

21        Congress has provided a limited scope of judicial review of a Commissioner's decision.  42

22   U.S.C. § 405(g).  A Court must uphold the Commissioner's decision, made through an ALJ, when

23   the determination is not based on legal error and is supported by substantial evidence.  *See Jones*

24   *v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

25   "The [Commissioner's] determination that a plaintiff is not disabled will be upheld if the findings

26   of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir.

27   1983) (*citing* 42 U.S.C. § 405(g)).  Substantial evidence is more than a mere scintilla, *Sorenson v.*

28   *Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975), but less than a preponderance.  *McAllister*

- 4 -

*v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted).  "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965).  On review, the Court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan,* 877 F.2d 20, 22 (9th Cir. 1989) (*quoting Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not this Court, to resolve conflicts in evidence. *Richardson,* 402 U.S. at 400.  If evidence supports more than one rational interpretation, the Court may not substitute its judgment for that of the Commissioner. *Tackett*, 180 F.3d at 1097; *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).  Thus, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).

## ALJ'S FINDINGS

The ALJ found at the onset that plaintiff meets the nondisability requirements and is insured for disability benefits through December 31, 2003.  (Tr.  334).   The ALJ found at step one that plaintiff has not engaged in substantial gainful activity since his onset date.  (Tr.  335).  At steps two and three, the ALJ found that plaintiff suffered from mild degenerative disc disease, gastrointestinal reflux disease ("GERD"),  controlled with medication, and mild chronic obstructive pulmonary disease ("COPD"), impairments that are severe but which do not alone or combination meet or medically equal a Listing impairment.  (Tr. 344).  At step two, the ALJ also found that plaintiff failed to establish that he suffered from a severe mental impairment.  (Tr. 345).   At step four, the ALJ found that  plaintiff was unable to perform his past relevant work.  (Tr.

351).  At step five of the sequential evaluation process, the ALJ relied on testimony from a vocational expert and found that plaintiff could perform other work that existed  in significant numbers in the economy, such as assembler, packager/filling machine operator, and hand packer. (Tr. 352).  Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 352).   The ALJ found that alcohol and/or drug abuse was not a contributing factor material to Plaintiff's disability. (Tr. 347.)

<b><u>ISSUES</u></b>

Plaintiff contends that the Commissioner erred as a matter of law.  Specifically, he argues that the ALJ erred by finding at step two that he does not suffer from a severe mental impairment. Plaintiff alleges the ALJ made this error erred by failing to give specific and legitimate reasons, supported by substantial evidence, for rejecting the opinions of physicians John McRae, Ph.D., Todd Green, M.D., David Bot, Jay Toews, Ed. D., Thomas McKnight, Ph.D., and Lori Pinter, ARNP.  Plaintiff's second contention is that the ALJ erred  by assessing an RFC for a significant range of light work.  (Ct. Rec. 15 at 11-18).

The Commissioner opposes the Plaintiff's motion for summary judgment and asks that the ALJ's decision be affirmed. (Ct. Rec. 21 at 22).

<b><u>DISCUSSION</u></b>

**A.  Step Two Finding**

In social security proceedings, the claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice. 20 C.F.R. § 416.908. The effects of all symptoms must be evaluated on the basis of a medically determinable impairment which can be shown to be the cause of the symptoms. 20 C.F.R. § 416.929. Once medical evidence of an underlying impairment has been shown, medical findings are not required to support the alleged severity of symptoms. *Bunnell v. Sullivan*, 947, F. 2d 341, 345 (9th Cr. 1991).

A treating or examining physician's opinion is given more weight than that of a non-examining physician. *Benecke v. Barnhart*, 379 F. 3d 587, 592 (9th Cir. 2004).  If the treating or

examining physician's opinions are not contradicted, they can be rejected only with clear and convincing reasons. *Lester v. Chater*, 81 F. 3d 821, 830 (9th Cir. 1996). If contradicted, the ALJ may reject an opinion if he states specific, legitimate reasons that are supported by substantial evidence. *See Flaten v. Secretary of Health and Human Serv.*, 44 F. 3d 1453, 1463 (9th Cir. 1995). In addition to medical reports in the record, the analysis and opinion of a non-examining medical expert selected by an ALJ may be helpful to the adjudication. *Andrews v. Shalala*, 53 F. 3d 1035, 1041 (9th Cir. 1995) (*citing Magallanes v. Bowen*, 881 F. 2d 747, 753 (9th Cir. 1989). Testimony of a medical expert may serve as substantial evidence when supported by other evidence in the record. *Id.*

Plaintiff contends that the ALJ erred by rejecting the opinions of several physicians and treatment providers. The Commissioner responds that, because the ALJ properly weighed the medical opinions and gave specific and legitimate reasons for rejecting some of them, her step-two finding should be affirmed. (Ct. Rec. 21 at 7-20).

John McRae, Ph.D., evaluated Plaintiff on November 5, 2001. (Tr. 589.) Plaintiff had not previously been to counseling and was unaware of if he had taken antidepressant or anti-anxiety medication. (Tr. 589.) He believed that he attended a special reading class during junior high school. (Tr. 589.) Plaintiff was arrested for DWI about 11 years ago, had not used alcohol since, and had never used illegal drugs, including marijuana. (Tr. 590.) After reviewing medical records, Dr. McRae pointed out that these statements appeared less than candid: "I note that his doctor describes his testing positive for marijuana around the time of his last job in 1998." (Tr. 590.) Initially Plaintiff told Dr. McRae he was good at math; later during testing, he failed multiplication, division, and subtraction problems. (Tr. 590.) Testing produced an invalid MMPI-II profile which suggested that Plaintiff overstates his symptoms. (Tr. 591.) Dr. McRae diagnosed adjustment disorder with depressed and anxious moods, rule out borderline intellectual function and rule out learning disabilities. (Tr. 591.) The ALJ noted that Dr. McRae pointed out inconsistencies in Plaintiff's statements, and behavior such as coughing more when discussing his breathing problems than at other times. (Tr. 347, 341.)

Plaintiff was initially diagnosed with a depressive disorder, nos, and a mood disorder due

to chemical exposure, in February of 2002, at Spokane Mental Health. (Tr. 679.) In an April 16, 2002, assessment, Lori Pinter, ARNP, noted Plaintiff took celexa, prilosec, an unnamed anti-nausea medication, and no over the counter medications. (Tr. 619, 621.) He suffered from depression and anxiety since his chemical exposure about 3 or 4 years earlier. (Tr. 619.) Plaintiff had not "seen anyone in the psychiatric profession before coming to Spokane Mental Health two months ago." (Tr. 620.) Ms. Pinter assessed depressive disorder, nos, and anxiety disorder, nos; rule out mood disorder, due to chemical exposure, with depressive features. (Tr. 621.) Ms. Pinter assessed a GAF of 50 and increased Plaintiff's low dosage of celexa. (Tr. 621.) The ALJ notes that the 3-4 year history of depression and anxiety reported to Ms. Pinter is not reflected in Plaintiff's medical records, and in December of 2002, Plaintiff indicated that he no longer wanted to participate in therapy. (Tr. 342, referring to Tr. 410.)

Plaintiff alleges that the ALJ failed to properly credit the opinion of examining physician David D. Bot, M.D. (Ct. Rec. 15 at 14-15). Dr. Bot examined Plaintiff on March 14, 2003. (Tr. 459-463.) He reviewed Plaintiff's records from the Spokane Mental Health Center. (Tr. 459.) Plaintiff quit therapy when public assistance "cut it off;" he described his therapy there as "futile." (Tr. 459.) He had a bad reaction to depakote in 2001 and as a result "they said I threatened a policeman." (Tr. 459.) Plaintiff elaborated that the incident resulted in charges of trespassing and physical control of a vehicle, which escalated to "attempted drive-by shooting." (Tr. 460.) He pleaded guilty to a misdemeanor, intimidating a public servant, and served 3 or 4 days in jail following his arrest. (Tr. 460.) Plaintiff denied suicidal feelings and did not desire counseling. (Tr. 459.) He denied drug use. (Tr. 460.) Memory difficulties on cognitive testing were inconsistent with Plaintiff's performance during the clinical exam. (Tr. 462.) Dr. Bot assessed an undifferentiated somatoform disorder, with problems and complaints related to lungs, headaches, and gastrointestinal difficulties seemingly in excess of what would be expected from Plaintiff's medical history. (Tr. 462-463.) Dr. Bot observed that Plaintiff did not cough in the waiting room but when called in began coughing and repeatedly clearing his throat. (Tr. 462.) Dr. Bot assessed a probable personality disorder, nos, and several moderate and marked limitations. (Tr. 463.) The ALJ noted that while Plaintiff told his counselor he quit therapy because he no longer wanted

it, he told Dr. Bot he quit for financial reasons. (Tr. 342-343.)  The ALJ also notes that Plaintiff's denial of using substances is contradicted by other evidence. (Tr. 343.)

The ALJ ordered a psychological evaluation. (Tr. 343.)  Prior to the evaluation on July 11, 2003, Jay M. Toews, Ed. D., reviewed the evaluation by John McRae, Ph.D., Ms. Pinter's notes, and notes from Spokane Mental Health. (Tr. 441).  Plaintiff complained of cognitive decline following his gas exposure. (Tr. 442).  He graduated from high school and never took special education classes. (Tr. 442).  Plaintiff marginally complied during testing.  Dr. Toews observed that Plaintiff had "pinpoint pupils" during two days of testing. (Tr. 443.)  Test results were "of dubious validity" and the "level of performance raises serious questions about possible malingering." (Tr. 443.)  The MMPI-2 test results "are patently invalid." (Tr. 445.)  Dr. Toews opined that depression is present and contributed to Plaintiff's poor effort during testing; however, in all probability, test results do not accurately reflect his cognitive abilities or memory. (Tr. 445.)  He went on to diagnose a probable cognitive disorder, nos; anxiety disorder, nos; major depressive disorder, recurrent, severe; and dysthymic disorder, early onset, and assessed moderate and marked limitations. (Tr. 445.)  The ALJ noted Dr. Mabee's testimony (see below) that, because Dr. Toews' test results are invalid, it is improper to draw any conclusions based on the invalid results. (Tr. 343.)  The ALJ also noted that no prior testing for depression had been administered, and some test results indicated possible malingering. (Tr. 343.)

At the hearing, medical expert W. Scott Mabee, Ph. D., testified that the record was sufficient to indicate some depression, but in terms of the level of impairment and other cognitive particular limitations which are noted, the record was insufficient. (Tr. 791.)  Dr. Mabee was unable form an opinion as to the level of severity of the mental impairments. (Tr. 792.)  The only thing he could conclude from the record is that there is some mood disturbance. (Tr. 792.)  Because Plaintiff alleged he suffered from toxic induced neuropsychological deficit, Dr. Mabee opined that further testing, targeting response style, could clarify the degree of mental impairment. (Tr. 791-793.)

After the hearing the ALJ ordered a further consultative evaluation to assess the nature and severity of any mental impairment.  Thomas McKnight, Ph. D., was specifically asked to "rule

out" malingering and drug and alcohol problems.  (Tr. 476.)

On June 7, 2004, Dr. McKnight reviewed Plaintiff's medical records from 1998 through March 11, 2003.  (Tr. 476-477.)  He noted that Dr. Bot heard no coughing when Plaintiff was in the outer office but that after entering, he constantly coughed and breathed heavily; the behavior was noted to diminish when ignored.  (Tr. 480.)  Dr. McKnight also heard location-specific coughing.  (Tr. 482.)  Dr. McKnight observed that, while Plaintiff showed balance problems and some difficulty walking in the office, he was seen walking easily in the parking lot without balance problems, and getting into a cab with no apparent difficulty.  (Tr. 482.)

Initially Plaintiff denied using street drugs but later admitted using marijuana, although not during the current year.  (Tr. 479.)  His legal history consisted of an arrest when he reacted poorly to medication and scared a police officer.  (Tr. 480.)  Dr. McKnight observed that Plaintiff "seemed overly medicated or intoxicated but there was no smell of alcohol or marijuana."  (Tr. 480.)  His  performance on the Portland Digital Recognition Test was less than random chance, as were portions of the Wechsler Memory Scale.  (Tr. 481.)  MMPI results showed that Plaintiff "was grossly overstating difficulty and the resulting clinical profile is invalid."  (Tr. 482.)  The results of the MCMI-III were invalid.  (Tr. 482.)  Dr. McKnight assessed malingering cognitive problems, depressive disorder nos, with noted embellishment, rule out polysubstance abuse, and possible somatization disorder but obvious malingering.  (Tr. 483.)  Given concerns of malingering, Dr. McKnight opined that the only limitations he could assess were mild or slight limitations on the Plaintiff's ability to work with or around others without being distracted by them; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation.  (Tr.  483.)

The ALJ weighed the contradictory medical opinions.  To aid her in this process, the ALJ evaluated Plaintiff's credibility.  (Tr. 345-349.)  Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and diagnosed condition.  *See Webb v. Barnhart*, 433 F. 3d 683, 688 (9th Cir. 2005).

The ALJ relied on several factors when assessing Plaintiff's credibility: (1) objective evidence does not support such debilitating limitations as Plaintiff alleges.  (Pulmonary function

tests indicated poor effort, and more objective testing (not dependent on effort) showed little, if any, objective abnormalities.)  (2) Psychological test scores support a conclusion of malingering.  (3) Plaintiff was observed coughing in various situations, yet when distracted or not observed, it lessened or stopped.  (4) Plaintiff made inconsistent statements.  (When asked to describe his education, he denied taking special education classes. (Tr. 539.)  On a different occasion, Plaintiff told Dr. McRae he attended special education classes. (Tr. 589.)  Similarly, the ALJ notes that Plaintiff has inconsistently described his drug and alcohol use.  (On February 12, 1999, Plaintiff told Dr. Bender he did not take illicit drugs.  (Tr. 162.)  In June of 1999, he tested  positive for marijuana.  (Tr. 189, 246.)  Although in July of 1999, Plaintiff was jailed over the weekend for drunk and disorderly conduct and on March 16, 2001, hospitalized for probable narcotic withdrawal (Tr. 319-320), he testified that he had never used alcohol or marijuana. (Tr. 784-786.)  The ALJ's credibility assessment is supported by the record.

With respect to her step-two analysis, the ALJ stated:

The claimant has failed to show that he has a severe mental impairment.

. . . As noted in the persuasive testimony of Dr. Mabee and the evidence as a whole, the record reflects malingering of both cognitive and other emotional problems.  Two attempts by the undersigned to develop the record with respect to the claimant's mental impairments were unsuccessful due to his failure to cooperate.  Over-reporting of mental problems (as well as physical problems, as discussed herein), make it impossible to determine the nature and extent of any mental impairment.

(Tr. 345.)

The ALJ found that Plaintiff failed to bring forth medical evidence of the existence of a severe mental impairment.  "Attempts to develop the record have been futile as the claimant has repeatedly over-reported his symptomology and given poor effort.  Psychological testing was invalid and consistent with exaggeration or a "fake bad" profile."  (Tr. 349).

An impairment or combination of impairments may be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb. Barnhart*, 433 F. 3d 683, 686-687 (9th Cir. 2005)(citing *Smolen v. Chater*, 80 F. 3d 1273, 1290 (9th Cir. 1996); *see Yuckert v. Bowen*, 841 F. 2d 303, 306 (9th Cir. 1988).  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation

should not end with the not severe evaluation step.  S.S.R. No. 85-28 (1985).  Step two, then, is "a de minimus screening device [used] to dispose of groundless claims," *Smolen*, 80 F. 3d at 1290, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence."  S.S.R. 85-28. The question on review is whether the ALJ had substantial evidence to find that the medical evidence clearly established that the claimant did not have a medically severe impairment or combination of impairments.  *Webb*, 433 F. 3d at 687; *see also Yuckert*, 841 F. 2d at 306.

The ALJ properly weighed the medical evidence.  There is evidence suggesting malingering, but no objective evidence of a severe mental impairment in the record.  The ALJ properly rejected the opinions of the physicians who based their opinions on Plaintiff's unreliable self-report, and relied instead on the results of objective testing which noted malingering, exaggeration, lack of effort, and invalid profiles.

To the extent that the medical record is not entirely clear with respect to the presence of a severe mental impairment, it is the opinion of the undersigned that this is due to the lack of effort by Plaintiff when presented with testing opportunities to prove or disprove the existence of a severe impairment.  The record does not include medical evidence of problems caused by depression or anxiety, alone or in combination, sufficient to pass the de minimus threshold of step two. *See Smollen*, 80 F. 3d at 1290.  The ALJ has an affirmative duty to supplement plaintiff's medical record, to the extent the record is incomplete, before rejecting an impairment at so early a stage in the analysis.  "In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Webb*, 433 F. 3d at 687, *citing Brown v. Heckler*, 713 F. 2d 441, 443 (9th Cir. 1983) (per curiam).  In this case the ALJ referred Plaintiff to Dr. Toews for testing and evaluation, took the testimony of Dr. Mabee, and referred Plaintiff to Dr. McKnight after the hearing for further testing and evaluation.  The ALJ then considered their opinions, the medical evidence and other evidence, and Plaintiff's credibility, when making her determination.  It is difficult to see what more the ALJ could have done.

The ALJ's finding at step two that plaintiff suffers from no severe mental impairment is clearly established by the medical evidence of record.

**B.    RFC for Significant Range of Light Work**

Plaintiff alleges that the residual functional capacity assessment is in error because the ALJ improperly discredited plaintiff's testimony. (Ct. Rec. 15 at 11, 15-18). The Commissioner responds that the ALJ properly weighed the medical evidence and plaintiff's credibility when she determined his RFC. (Ct. Rec. 21 at 9-13, 20-21).

The court has addressed the ALJ's credibility assessment and turns to the RFC finding with respect to Plaintiff's physical impairments.

Plaintiff asserted that he suffered chemical exposure while working on September 17 and September 22, 1998. (Tr. 154-155.) On September 24, 1998, he saw William England, M.D., with complaints of cough and chest discomfort after being "exposed to gasses." (Tr. 154.) On September 17, plaintiff described "working around a lime kilm and feels like he had inhaled some gas there" and on September 22, a pipe sprayed out "either black or white liquor" striking him and causing fume inhalation. (Tr. 155.) Plaintiff said he smoked a pack of cigarettes daily, but his supervisor described him as a "heavy smoker." (Tr. 155.) Dr. England assessed irritant bronchitis, prescribed an albuterol inhaler and prednisone, advised smoking cessation, and returned Plaintiff to full work duties. (Tr. 155.) On September 30, 1998, he opined that Plaintiff required no additional treatment or testing, no residual effects were expected, 1-2 days is the usual recovery time, and one week is the likely period to reach medical stability. (Tr. 156.) Dr. England did not anticipate assessing a ratable impairment. (Tr. 157.)

On October 5, 1998, plaintiff saw Edward Maloney, M.D., for coughing, a burning sensation in his chest, headache and upset stomach. (Tr. 243.) His chest sounded a bit hyper-resonant on the right and normal on the left. (Tr. 243.) Dr. Maloney prescribed a steroid inhaler and a medrol dose pack. (Tr. 243). Plaintiff returned on October 13, 1998, complaining that his lungs were worse. (Tr. 243.) His lungs were clear on exam. Dr. Maloney referred Plaintiff to Dr. Green, a pulmonologist, and prescribed darvocet for headaches. (Tr. 243.) Dr. Maloney's later records reflect that plaintiff tested positive for cannabis at the time of his chemical exposure, and that he was incarcerated "for being drunk and disorderly" prior to an appointment on July 6, 1999. Lab tests screening for heavy metals were negative. (Tr. 246-247.) On December 14, 1999, plaintiff was "stressed and depressed," so Dr. Maloney doubled the dose of a bedtime tricyclic

- 13 -

antidepressant.  (Tr.  250.)

On October 14, 1998, Plaintiff saw Todd Green, M.D., for persistent cough, mucoid sputum, dyspnea on exertion, occasional wheezing, persistent headache with mild lightheadedness, and persistent nausea with adequate appetite.  (Tr. 195.)  Dr. Green reviewed reports indicating that the fumes plaintiff was exposed to included calcium carbonate, sodium hydroxide and sodium sulfide, and, apparently, a byproduct of the pulp producing process.  (Tr. 195.)  Plaintiff smoked six cigarettes daily for 3-4 years and did not currently smoke.  (Tr. 195.)  His weight was stable and he appeared in no acute distress.  (Tr. 195.)  Breath sounds were mildly diminished bilaterally. (Tr. 196.)  A chest x-ray taken on October 5, 1998, and pulse oximetry testing were normal.  (Tr. 196.)  Dr. Green's pulmonary function analysis showed mild obstructive airways disease, slight bronchodilator responsiveness, normal lung volumes and normal diffusion.  (Tr. 196.)  He stated:

> It appears likely that the ingredients involved produced an acute asthmatic type illness that might be characterized as reactive airways dysfunction syndrome.  Mild obstructive airways disease reversibility is documented today.  There is a concern that the patient's illness persists one month after exposure. . . systemic steroid therapy may still be of benefit.

(Tr. 196.)  Plaintiff was to remain off work for at least one month, continue  medical therapy and monitoring, and, if not improved over the next month, undergo a methacholine challenge study to further document the presence of bronchial hyper-responsiveness.  (Tr. 196.)

On November 5, 1998, Plaintiff told Dr. Green that his cough paroxysms were less frequent, though he continued to complain of persistent dyspnea, cough, fatigue, headaches and dizziness.  (Tr. 198.)  He also complained of left chest pain, aggravated by coughing.  (Tr. 198.) Breath sounds were normal.  Dr. Green adjusted medications, continued Plaintiff off of work, and ordered a CXR.  (Tr. 198.)  Plaintiff returned on December 3, 1998.  He complained that his dyspnea and cough worsened, and he was unable to tolerate any extended activity.  (Tr. 198.)  He described sharp bilateral chest pains and numbness in both hands and fingers.  (Tr. 198.)  Plaintiff denied tobacco use, and frequently coughed and cleared his throat during the appointment. Spirometry testing revealed significant obstructive defect.  (Tr. 199.)  Dr. Green assessed unresolved asthma, presently exacerbated, with musculoskeletal chest pain, and did not release Plaintiff for work.  (Tr. 199.)  On December 23, 1998, Plaintiff's dyspnea and cough "improved although still significant."  (Tr. 199.)  Chest pain improved, but he complained of headache,

- 14 -

abdominal and flank "kidney" pains.  (Tr. 199.)  Plaintiff had not seen Dr. Maloney as Dr. Green had suggested.  (Tr. 199.)  A medical case manager accompanied Plaintiff to the appointment and suggested an IM (independent medical) referral. (Tr. 199.)  Dr. Green noted that Plaintiff's severe asthma was slightly improved.  (Tr. 199.)

On March 1, 1999, Dr. Green saw Plaintiff for follow up after evaluations by Dr. Whitehouse and a neurologist.  (Tr. 201.)  Dr. Green's review of these records revealed "[plaintiff] had only minimal obstructive defect noted," and the neurological exam yielded no significant findings.  (Tr. 201.)  Plaintiff said he had been told to return to work and that he could stop medical therapy.  He expressed "frustration and dissatisfaction with both his case manager and Dr. Whitehouse."  (Tr. 201.)  He recently saw Dr. Maloney, who ordered  blood work and a GI evaluation.  (Tr. 201.)  Dr. Green continued plaintiff's medical therapy.  (Tr. 201.)  On April 15, 1999, Dr. Green saw plaintiff after an IME with Dr. Rick (Richard) Lambert.  (Tr. 202) (Dr. Lambert's findings are outlined below).  Plaintiff complained of symptoms that continued to a variable degree.  He was partially compliant with medication.  (Tr. 202.)  Dr. Green agreed with Dr. Lambert that further objective assessment, including a methacholine challenge test, was reasonable.  (Tr. 202.)

On May 6, 1999, Dr. Green noted plaintiff's symptoms remained unchanged, although the results of the April 26, 1999, methacholine study demonstrated no obstructive airways disease and normal pulmonary function.  (Tr. 172, 203.)  **Dr. Green noted: "Previous impression of reactive airways dysfunction syndrome is now questioned given the ongoing symptoms with negative methacholine challenge result."**  (Tr. 203.)  Dr. Green ordered a cardiopulmonary exercise study. If normal, Plaintiff was to return to work.  (Tr. 203.)

Flu caused Plaintiff to cancel his cardiopulmonary exercise study on June 7, 1999.  (Tr. 203.)  On June 30, 1999,  Dr. Green's office learned that plaintiff was in custody in Stevens County and had no medication.  (Tr. 203.)  On April 17, 2001, Dr. Green noted he had not seen Plaintiff for nearly two years.  (Tr. 299.)  Spirometry testing at that time showed markedly abnormal results and was "suspicious for sub-optimal effort."  (Tr. 299.)  Dr. Green requested complete pulmonary function testing but Plaintiff did not return until February 28, 2002.  (Tr. 299, 449.)  Dr. Green opined that Plaintiff obviously has chronic anxiety and needed mental health

assistance for anxiety and depressed mood.  (Tr. 449-450.)  Spirometry testing did not indicate obstructive airways disease.  (AR 449).  Dr. Green opined that further pulmonary testing might be useful.  (Tr. 450.)   When Plaintiff returned on April 2, 2002, Dr. Green recommended another methacholine study; if negative, he recommended no further pulmonary work up.  (Tr. 451.)  On June 6, 2002, Dr. Green diagnosed GERD based on an upper GI x-ray.  (Tr. 451.)  The methacholine study was "remarkable only for suboptimal effort."  (Tr. 451.)  Dr. Green concluded: "I am not able to assist him with his claim for either work related injury or disability."  (Tr. 451.)

On January 7, 1999, Alan Whitehouse, M.D., observed that plaintiff coughed continually, could not sit still, is "jumping around all the time and is extraordinarily anxious."  (Tr. 158). Plaintiff described his initial chemical exposure and resultant cough, which continued and worsened.  (Tr. 158).  His second exposure involved liquid which "enveloped all of him and he may have swallowed some."  (Tr. 158).  The cough had continued, he had chronic headaches, irritability, an inability to sit still, stomach pain and an inability to eat, but no weight loss.  (Tr. 159).  Plaintiff denied using illicit drugs, including marijuana.  (Tr. 159).  He took darvocet for headaches, prednisone, and used an albuterol nebulizer.  Dr. Whitehouse reviewed an October 1998 chest x-ray as normal.  (Tr. 159).

Plaintiff's chest was totally clear with a very faint terminal expiratory wheeze "but was remarkably clear, although, he could not take a deep breath without coughing."  (Tr. 159).  A new chest x-ray was taken; it too was normal.  (Tr. 159).  Dr. Whitehouse was "very unclear" as to what was "going on with Mr. Wichterman."  (Tr. 159).  He prescribed flovent and a cough suppressant, suggested Excedrin migraine (a nonprescription medication) for headaches, and ordered additional testing.  (Tr. 159).

On January 27, 1999, Plaintiff told Dr. Whitehouse his cough was somewhat better but he complained of terrible headaches.  (Tr. 160.)  He continued to be jittery and unable to sit still.  (Tr. 160.)  Plaintiff's chest was totally clear.  Dr. Whitehouse was uncertain if Plaintiff's cough was real or fictitious.  When Dr. Whitehouse was out of the examining room for "quite a while," he did not hear coughing.  Dr. Whitehouse opined that Plaintiff should see a neurologist because he was unsure if he had a "real disease or not;" alternatively, a psychological evaluation might be useful. (Tr. 160.)

- 16 -

When he saw neurologist William Bender, M.D., on February 12, 1999, Plaintiff complained of chronic daily headaches, "constant nausea since last September," short term memory lapses, and feeling tired all the time.  (Tr. 162.)  He admitted consuming 1-2 drinks per month and denied illicit drug use (including marijuana).  (Tr. 162.)  Plaintiff's lungs were clear. (Tr. 162.)  Dr. Bender assessed multiple somatic complaints including chronic daily headaches since September 1998.  (Tr. 163.)  He concluded that "there appears to be no organic basis to the patient's neurological complaints."  (Tr. 163.)  Dr. Bender opined that the use of darvocet or any analgesic was unlikely to be beneficial, but a behavioral or psychiatric evaluation might be helpful.  (Tr. 163.)

On March 29, 1999, Richard Lambert, M.D., performed an IME.  (Tr. 164-171.)  Plaintiff complained of persistent cough, sputum production, chest pain, exertional dyspnea, and fatigue and headaches, although his headaches had abated as had his upset stomach.  (Tr. 165.)  Dr. Lambert reviewed Dr. Maloney's records and noted that on October 5, 1998, just after the exposure, plaintiff's exam was normal: chest x-rays and PFTs were both normal.  (Tr. 166.)  Dr. Lambert observed Dr. Green's October 14, 1998, notation that PFTs revealed mild obstructive disease; PFTs on December 3, 1998, indicated extremely poor effort by Plaintiff; effort so poor that the results were "essentially unable to be interpreted."  (Tr. 166-167.)  On December 23, 1998, very poor effort on PFTs is noted.  (Tr. 167.)  Dr. Lambert observed that Dr. Whitehouse, on February 16, 1999, and February 18, 1999, noted that labs were normal.  (Tr. 167.)  Followup PFTs in Dr. Green's office on March 1, 1999, showed very poor patient effort, to the extent that Dr. Lambert found them not interpretable.  (Tr. 167.)  Dr. Lambert noted that during his exam, plaintiff coughed intermittently but not severely.  (Tr. 168.)  Respiratory rate and rhythm were normal, and lungs were clear to auscultation and percussion without expiratory wheezing or rales. (Tr. 169.)  Dr. Lambert noted that while plaintiff's initial PFT indicated normal flow rates, all subsequent tests in Dr. Green's office indicated a poor effort on the patient's part rendering the results "essentially uninterpretable for obstructive airways disease."  (Tr. 170.)  Further testing with exercise tolerance might be useful, but Plaintiff currently had adequate pulmonary functions to return to his previous work, though this was difficult to assess given the inadequacies of the PFTs.  (Tr. 170-171.)  On April 29, 1999, Dr. Lambert recommended exercise tolerance testing

- 17 -

and a methacholine challenge test.  (Tr. 281.)

On July 7, 1999, Plaintiff underwent a treadmill stress test.  (Tr. 180, duplicated at Tr. 587.)  Dr. Lambert's interpretation of this data was "that this patient has [sic] significant degree of hyperventilation . . .  The patient may have a mild early anaerobic threshold compatible with deconditioning, but otherwise does not appear to have a severe cardiovascular limit to exercise as evidenced by minimal increase in heart rate."  (Tr. 180.)

On September 10, 1999, J. Robert Clark, M.D., noted that plaintiff's CT of head and sinuses was essentially normal.  He recommended tricyclic antidepressants or depakote, apparently to control headaches.  (Tr. 181-183.)

Also on September 10, 1999, examining physician Paula Lantsberger, M.D., opined that plaintiff falls into a category IV impairment, according to the AMA guidelines.  (Tr. 184, 185-192.)  This equated to a 60% impairment of the whole person, and was based on the results of three tests: SCV, FEV, and DLCO.  (Tr. 184.)  On November 8, 1999, Dr. Lantsberger reviewed PFTs administered by Dr. Green on October 27, 1999, after plaintiff was off of medication for two weeks.  (Tr. 193.)  She found these results consistent with those given previously, and noted they were interpreted by Dr. Green as "severe obstructive defects."  (Tr. 193.)  Dr. Lantsberger did not have access to later test results.

On January 28, 2000, Daniel Stoop, M.D., indicated that he treated Plaintiff from September 24, 1998, through January 28, 2000.  (Tr. 216.)  On January 28, 2000, Dr. Stoop opined that Plaintiff suffered from "severe occupational asthma resulting in 100% disability."  (Tr. 216.)  He acknowledged that pulmonologist Dr. Green treated Plaintiff for the same disability.  (Tr. 217.)  By April 30, 2002, Dr. Stoop's opinion changed.  With respect to Plaintiff's alleged lung impairment, Dr. Stoop noted there is very little, if any, objective evidence of continued, ongoing problems.  (Tr. 698.)  Plaintiff's reflux disease was treated with daily medication; ulcer disease is not documented; he knew of "no arthritic changes evident by objective evaluation" nor of any "objective mental health evaluation qualifying him [Plaintiff] for any disability."  (Tr. 698.)  On September 9, 2003, ER physician Stephen Penaskovic, M.D., saw Plaintiff for chest pain and contacted Dr. Stoop.  (Tr. 465.)  Dr. Stoop advised that, "despite the patient's multiple complaints, he has not had any significant identifiable diagnosis made" and Dr. Stoop "has

questioned if the patient's multiple complaints are really due to any organic disease." (Tr. 465.)

The objective medical evidence provided by Plaintiff's treating and examining physicians fully supports the ALJ's finding that Plaintiff has the RFC to perform a significant range of light work. The ALJ's assessment of Plaintiff's credibility is without error and supported by the evidence.

The record contains evidence of sporadic alcohol and drug use. (Tr. 346.) Plaintiff denied in his testimony any problems with substance abuse. The ALJ found that "the record does not show that alcohol/drug abuse is present for a period meeting the 12-month durational requirements of the Act or that it is causing any work-related limitations." (Tr. 346-347.) The ALJ's finding that alcohol/drug abuse is not a contributing factor material to disability is free of error.

## CONCLUSION

Having reviewed the record and the ALJ's conclusions, this court finds that the ALJ's decision at step two that plaintiff suffers from no severe mental impairment is clearly established by the medical evidence. The court finds that the remainder of the ALJ's decision is also free of legal error and supported by substantial evidence.

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment **(Ct. Rec. 14)** is **GRANTED.**

2. Plaintiff's Motion for Summary Judgment **(Ct. Rec. 20)** is **DENIED.**

The District Court Executive is directed to file this Order, provide copies to counsel for Plaintiff and Defendant, enter judgment in favor of Defendant, and **CLOSE** this file.

DATED this 30th day of July, 2007.

/s/ J. Kelley Arnold

J. KELLEY ARNOLD
UNITED STATES MAGISTRATE JUDGE